UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| Jerry Moore, Yuriy Golonko, Nicole Pass, Sonya Dewberry, Dorothy Jackson, Anthony Osborn and Dwain Jones,<br><br>Plaintiffs,<br>vs.<br><br>BMW of North America, LLC and Bavarian Motor Works,<br><br>Defendants. | Civil Action No.: _____<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

For this Complaint, the Plaintiffs* Jerry Moore, Yuriy Golonko, Nicole Pass, Sonya Dewberry, Dorothy Jackson, Anthony Osborn and Dwain Jones, by undersigned counsel, state as follows:

## PRELIMINARY STATEMENT

1. This is a group action by the purchasers of vehicles (hereafter the "subject vehicles") manufactured and sold by the Defendants BMW of North America, LLC and Bavarian Motor Works. Plaintiffs seek damages related to their vehicles' excessive consumption of engine oil and Defendants' failure to honor the terms of their warranty.

2. The Plaintiffs would not have purchased the subject vehicles had they been made aware of the subject vehicles' defective engines.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to the Magnuson-Moss Federal Act, 15 U.S.C. § 2310(d)(1)(B), in that the Plaintiffs claim more than $50,000.00 in damages, exclusive of interest and costs, and under the doctrine of supplemental jurisdiction as set forth in 28 U.S.C. § 1367.

4. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) as Defendants are subject to personal jurisdiction in this District and where Defendants, as principals, direct and control warranty repairs on covered vehicles through its agents consisting of a dealership network located in this District.

---

*Additional Plaintiffs may be added at a later date.

5. Further, venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the Plaintiffs' claims occurred within this District.

## PARTIES

6. Plaintiffs were, at all relevant times, adult individuals who either reside in Georgia or who purchased motor vehicles in Georgia which were manufactured or sold by Defendants.

7. Defendant BMW of North America, LLC ("BMW-NA") is organized under the laws of Delaware with its principal place of business located at 300 Chestnut Ridge Road, Woodcliff, New Jersey. BMW-NA was created in 1975 to act as the United States importer of BMW luxury and performance vehicles, which were traditionally manufactured in Munich, Germany. At all relevant times, BMW was engaged in the business of importing, assembling, marketing, distributing, and warranting BMW automobiles in the State of Massachusetts and throughout the United States.

8. Defendant Bavarian Motor Works ("BMW-GER") is a corporation organized and existing under the laws of Germany, with its principal place of business located in Munich, Bavaria, Germany. BMW-GER is the parent corporation of BMW of North America, LLC.

9. BMW-NA and BMW-GER sell BMW vehicles through a network of independently owned dealerships across the United States that are agents of BMW-NA and BMW-GER.

## FACTUAL ALLEGATIONS APPLICABLE TO INDIVIDUAL PLAINTIFFS

### I. Jerry Moore

10. Plaintiff Jerry Moore (hereafter "J. Moore") is an adult individual residing in Marietta, Georgia.

11. On or about July 27, 2013, J. Moore purchased a used 2011 BMW 750i, Vehicle Identification Number WBAKA8C54BCY37313 (hereafter the "J. Moore Vehicle") from Tom Bush Regency Motors in Jacksonville, Florida, an authorized dealer of the Defendants.

12. Soon after purchasing the J. Moore Vehicle, J. Moore observed that it consumed an excessive amount of engine oil which initially required him to add one quart of oil every 1,600 miles, well before the Defendants' recommended oil change intervals.

13. On December 15, 2013, J. Moore notified an authorized dealer of the Defendants that said vehicle consumed an excessive amount of engine oil.

14. In response, J. Moore was told there was an oil leak and the BMW dealer purported to repair the leak. However, the J. Moore Vehicle's oil consumption grew progressively worse.

15. On or about March 10, 2015, BMW dealer performed a "N63 Customer Care Package" and replaced vacuum pump and all injectors in the J. Moore Vehicle.

16. However, the J. Moore Vehicle continued to consume excessive amount of oil and required J. Moore to add one quart of oil every 1,000 miles, well before the Defendants' recommended oil change intervals.

17. J. Moore notified an authorized dealer of the Defendants during the warranty period that the J. Moore Vehicle continued to consume an excessive amount of engine oil.

18. In response, J. Moore was told the oil consumption was normal: "that's just how BMW's are – you'll always need oil in between services."

19. As a result of the J. Moore Vehicle's excessive consumption of engine oil, J. Moore consistently had to add engine oil to the J. Moore Vehicle in between the Defendants' recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

## II. Yuriy Golonko

20. Plaintiff Yuriy Golonko (hereafter "Y. Golonko") is an adult individual residing in Everett, Washington.

21. On or about September 18, 2013, Y. Golonko purchased a used 2011 BMW X6, Vehicle Identification Number 5UXFG8C55BLZ95211 (hereafter the "Y. Golonko Vehicle") from Select Luxury Cars in Marietta, Georgia.

22. Within a year after purchasing the Y. Golonko Vehicle, Y. Golonko observed that it consumed an excessive amount of engine oil which initially required him to add two quarts of oil every 1,000 miles, well before the Defendants' recommended oil change intervals.

23. Y. Golonko notified an authorized dealer of the Defendants throughout the warranty period that the Y. Golonko Vehicle consumed an excessive amount of engine oil. However, no repair or solution to the oil consumption issue was offered.

24. After Y. Golonko made numerous complaints to an authorized dealer, in 2015 the Defendants provided Y. Golonko with the BMW Customer Care Package. The Customer Care Package consisted of several different measures which masked, but did not correct, the Y. Golonko Vehicle's oil consumption defect.

25. Since receipt of the Customer Care Package, Y. Golonko adds two quarts of oil every 2,500 miles, still well before the Defendants' recommended oil change intervals.

26. As a result of the Y. Golonko Vehicle's excessive consumption of engine oil, Y. Golonko had to add engine oil to the Y. Golonko Vehicle in between the Defendants' recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

### III. Nicole Pass

27. Plaintiff Nicole Pass (hereafter "N. Pass") is an adult individual residing in Smryna, Georgia.

28. On or about September 19, 2013, N. Pass purchased a used 2011 BMW 750li, Vehicle Identification Number WBAKB8C52BC852101 (hereafter the "N. Pass Vehicle") from Global Imports BMW in Atlanta, Georgia, an authorized dealer of the Defendants.

29. During the first year after purchasing the N. Pass Vehicle, N. Pass observed that it consumed an excessive amount of engine oil which initially required her to add one quart of oil every 2,500 to 2,800 miles, well before the Defendants' recommended oil change intervals.

30. On November 8, 2013, N. Pass notified an authorized dealer of the Defendants that said vehicle smoked and oil light kept coming on. In response, the BMW dealer told N. Pass there was a fuel injector leak and that it repaired the leak. However, the N. Pass Vehicle continued to consume excessive amount of oil.

31. On June 13, 2014, N. Pass notified an authorized dealer of the Defendants that said vehicle was losing oil. In response, the BMW dealer replaced a vacuum pump.

32. On June 13, 2014, N. Pass notified an authorized dealer of the Defendants that said vehicle continued to lose oil. In response, the BMW dealer replaced a oil sump gasket.

33. On July 8, 2015, the BMW dealer implemented the BMW Customer Care Package on N. Pass Vehicle and reprogrammed its oil service intervals from 15,000 miles to 10,000 miles.

34. On September 17, 2015, N. Pass notified an authorized dealer of the Defendants that N. Pass Vehicle oil light was on and N. Pass still continued to constantly add oil to the vehicle's engine. In response, the BMW dealer performed an oil change.

35. On February 8, 2018, N. Pass notified an authorized dealer of the Defendants that said vehicle still appeared to be losing oil. In response, the BMW dealer dealer performed an oil change.

36. Furthermore, throughout the warranty period and in the course of numerous visits to an authorized dealer of the Defendants N. Pass notified such dealer that the N. Pass Vehicle consumed an excessive amount of engine oil.

37. In response, N. Pass was told the oil consumption was normal, and accordingly, N. Pass was told the vehicle's consumption of engine oil did not warrant any repairs.

38. As a result of the N. Pass Vehicle's excessive consumption of engine oil, N. Pass had to add engine oil to the N. Pass Vehicle in between the Defendants' recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

**IV.    Sonya Dewberry**

39. Plaintiff Sonya Dewberry (hereafter "S. Dewberry") is an adult individual residing in Griffin, Georgia.

40. On or about March 21, 2013, S. Dewberry purchased a used 2010 BMW 750LXi, Vehicle Identification Number WBAKC8C56ACY68264 (hereafter the "S. Dewberry Vehicle") from a dealer in Stockbridge, Georgia.

41. Within two months after purchasing the S. Dewberry Vehicle, S. Dewberry observed that it consumed an excessive amount of engine oil which initially required her to add one quart of oil every 300 miles, well before the Defendants' recommended oil change intervals.

42. S. Dewberry notified an authorized dealer of the Defendants on many occasions throughout the warranty period that the S. Dewberry Vehicle consumed an excessive amount of engine oil.

43. In response, S. Dewberry was told to just "put in extra oil," and no repair was offered.

44. Further, on July 19, 2015, the BMW dealer implemented the BMW Customer Care Package on S. Dewberry Vehicle and reprogrammed its oil service intervals.

45. As a result of the S. Dewberry Vehicle's excessive consumption of engine oil, S. Dewberry had to add engine oil to the S. Dewberry Vehicle in between the Defendants' recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

**V.    Dorothy Jackson**

46. Plaintiff Dorothy Jackson (hereafter "D. Jackson") is an adult individual residing in Warner Robins, Georgia.

47. On or about September 28, 2013, D. Jackson purchased a used 2011 BMW 550i, Vehicle Identification Number WBAFR9C58BC618032 (hereafter the "D. Jackson Vehicle") from BMW of Macon in Macon, Georgia, an authorized dealer of Defendants.

48. Within a few months after purchasing the D. Jackson Vehicle, D. Jackson observed that it consumed an excessive amount of engine oil which required her to add one

quart of oil every 1,000 miles or less, well before the Defendants' recommended oil change intervals.

49. D. Jackson notified an authorized dealer of the Defendants throughout the warranty period that the D. Jackson Vehicle consumed an excessive amount of engine oil.

50. In response, D. Jackson was told "turbo charge engines burn a lot of oil," and accordingly, D. Jackson was told the vehicle's consumption of engine oil did not warrant any repairs.

51. As a result of the D. Jackson Vehicle's excessive consumption of engine oil, D. Jackson had to add engine oil to the D. Jackson Vehicle in between the Defendants' recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

**VI.   Anthony Osborn**

52. Plaintiff Anthony Osborn (hereafter "A. Osborn") is an adult individual residing in Atlanta, Georgia.

53. In 2014, A. Osborn purchased a used 2011 BMW X6 XDrive 50i, Vehicle Identification Number 5UXFG8C56BLZ95864 (hereafter the "A. Osborn Vehicle") from Global Imports BMW in Atlanta, Georgia, an authorized dealer of the Defendants.

54. Shortly after purchasing the A. Osborn Vehicle, A. Osborn observed that it consumed an excessive amount of engine oil which required him to add two quarts of oil every 3,000 miles, well before the Defendants' recommended oil change intervals.

55. A. Osborn notified an authorized dealer of the Defendants throughout the warranty period that the A. Osborn Vehicle consumed an excessive amount of engine oil.

56. In response, A. Osborn was told usually this is not an issue with BMW 6 series vehicles, this was just his car and that was an anomaly. Accordingly, A. Osborn was told the vehicle's consumption of engine oil did not warrant any repairs.

57. As a result of the A. Osborn Vehicle's excessive consumption of engine oil, A. Osborn had to add engine oil to the A. Osborn Vehicle in between the Defendants' recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

**VII.  Dwain Jones**

58. Plaintiff Dwain Jones (hereafter "D. Jones") is an adult individual residing in Winston Salem, North Carolina.

59. On or about October 25, 2016, D. Jones purchased a used 2013 BMW X5 XDrive 50i, Vehicle Identification Number WBA6B2C58DD128179 (hereafter the "D. Jones Vehicle") from Atlanta Autos in Marietta, Georgia.

60. Within a few months after purchasing the D. Jones Vehicle, D. Jones observed that it consumed an excessive amount of engine oil which required him to add one quart of oil every 2,000 miles, well before the Defendants' recommended oil change intervals.

61. D. Jones notified an authorized dealer of the Defendants during the warranty period that the D. Jones Vehicle consumed an excessive amount of engine oil.

62. In response, D. Jones was told "this is typical of these cars," and accordingly, no repair was offered to D. Jones for the vehicle's consumption of engine oil.

63. As a result of the D. Jones Vehicle's excessive consumption of engine oil, D. Jones had to add engine oil to the D. Jones Vehicle in between the Defendants' recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL PLAINTIFFS

64. Defendants manufactured and placed into the stream of commerce each of the aforementioned vehicles (the subject vehicles), which the Plaintiffs subsequently purchased.

65. At the time Plaintiffs purchased the subject vehicles, Defendants made representations as to the subject vehicles' performance and quality and assured the Plaintiffs that the subject vehicles were free from defects of workmanship.

66. Thereafter, Plaintiffs discovered that, unbeknownst to them, the subject vehicles' engines contain a manufacturing defect which causes each of the subject vehicles to consume engine oil at an extremely rapid rate.

67. Moreover, Plaintiffs discovered that as a result of the subject vehicles' above-described defect, Plaintiffs were required to regularly add additional engine oil to their vehicles in between the Defendants' recommended oil change intervals in order to prevent their vehicles' engines from failing and suffering from other related damage.

68. In 2008, BMW introduced a new V8, twin-turbocharged engine, which BMW and enthusiasts refer to as the "N63." This large, high-performance engine was designed to be BMW's next generation V8 and was placed in certain BMW 5 Series, 6 Series, 7 Series, X5, and X6 vehicles from the 2009 through 2014 model years.

69. Upon information and belief, the N63 engine was included on the V8 versions of the following BMW vehicles:

    F01 and F02 (7 Series Sedan) – produced from 3/2009 to 6/2012
    F04 (Active Hybrid 7) – produced from 4/2010 to 6/2012

7

       F07 (Gran Turismo) – produced from 9/2009 to 6/2012
       F10 (5 Series Sedan) – produced from 3/2010 to 7/2013
       F12 (6 Series Convertible) – produced from 3/2011 to 7/2012
       F13 (6 Series Coupe) – produced from 7/2011 to 7/2012
       E70 (X5) – produced from 3/2010 to 6/2013
       E71 (X6) – produced from 7/2008 to 6/2014
       E72 (ActiveHybrid X6) – produced from 9/2009 to 9/2011

70. The subject vehicles are all equipped with the N63 engine.

71. The N63 has become widely known and described as defective throughout the automotive industry and the BMW-enthusiast community. It is widely recognized that N63 engines consume excessive amounts of engine oil and require frequent engine repairs, especially as compared to other, similar vehicles not containing N63 engines.

72. Some owners and enthusiasts blame the oil consumption on BMW's decision to place the N63's twin-turbochargers between the cylinder heads, and inside of the engine V, rather than outside of the engine V, away from sensitive components, where turbochargers are typically located.

73. N63 vehicles are notorious for consuming excessive amounts of engine oil and frequently need additional engine oil between scheduled oil changes to prevent catastrophic engine damage or failure.

74. The oil consumption defect was particularly apparent in a recent Consumer Reports study on excessive oil consumption. Consumer Reports studied 498,900 vehicles across several makes and models for complaints about engine oil consumption and concluded that BMW's N63 engine was included on four out of the five most defective vehicles. (http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

75. The V8 version of the BMW 5 Series, which contained the N63 engine in 2011, 2012, and 2013 model years, was the worst performer in the study with 43 percent of vehicles needing an additional quart of oil between oil changes as of 2015. BMW's 6 Series and 7 Series, many of which contained the N63 engine, are the next worst performers. Finally, the V8 version of the X5 was the fifth worst performer in the study.

76. The Consumer Reports study also shows that a greater percentage of defective models start to consume oil as they age. This means that large numbers of N63 owners will begin to experience the oil consumption defect in the near future if they have not already.

77. Many purchasers of vehicles containing the N63 engine have become upset about the excessive engine oil consumption – which was not disclosed by BMW in the product literature – and have posted internet complaints about specific frustrations and hassles caused by the oil consumption defect.

8

78. For example, one N63 purchaser started a thread entitled, "Excessive oil consumption" on a BMW enthusiast website in November 2011:

> So I'm starting to get a little irritated at how much oil my 550 is burning. In the last 6k I've had to add 1 quart of oil three times. In other words it is burning a quart every 2000 miles. I've read about some people posting about having to add oil before but this much?? I've never owned a new car that burned any oil much less at this rate. Anyone else having this issue? Oh btw the car has 9120 miles and I put 3100 in Europe during my ED. When I was to have redelivery I had the dealer do an oil change and was gonna change the oil every 7.5k.

(http://www.bimmerfest.com/forums/showthread.php?t=581072.)

79. A fellow BMW enthusiast responded with four separate links about the oil consumption issue and explained that the defect "was a hot topic back in September" 2011. (*Id.*)

80. An Internet search of "N63 AND Burning Oil" reveals thousands of similar complaints regarding the oil consumption defect.†

81. BMW had a duty to disclose the oil consumption defect and the associated out-of-pocket repair costs since the defect poses an unreasonable safety hazard, and because BMW had exclusive knowledge or access to material facts about N63 vehicles and engines, not known or reasonably discoverable by consumers. Defendants, however, failed to disclose the defect to consumers prior to or at the time of purchase or lease.

82. The oil consumption defect has become so problematic that BMW has issued several technical service bulletins ("TSBs") to address complaints of excessive oil consumption and other problems related to the N63 engine.‡

83. With regard to the oil consumption issue, BMW issued the following TSBs:

> NHTSA ID Number: 10046859
> Service Bulletin Number: SIB-11-08-12
> Summary: DUE TO DAMAGED SEAL RING, DURING ASSEMBLY, ENGINE OIL IS LEAKING FROM ENGINE OIL PUMP VOLUME CONTROL VALVE GASKET SEAL RING. MODELS E70, E71, F01, F02, F04, F07, F10, F12, F13. NO MODEL YEARS LISTED.

---

† See, e.g., http://www.bimmerfest.com/forums/showthread.php?t=581072 (last visited Mar. 21, 2016); http://www.e90post.com/forums/showthread.php?t=874786 (last visited Mar. 21, 2016).

‡ TSBs are recommended repairs issued by automotive manufacturers and directed only to automotive dealers. TSBs are frequently issued when a manufacturer receives widespread reports of a particular problem with its vehicles.

> NHTSA ID Number: 10045282
> Service Bulletin Number: SIB-11-07-12
> Summary: BMW: WHILE DRIVING VEHICLE, AT TIMES WOULD BE ROUGH RUNNING; WHITE OR BLUE SMOKE SEEN EXITING EXHAUST SYSTEM AND THE ENGINE OIL IS CONSUMED ABOVE SPECIFICATIONS.

84. In June 2013, BMW issued SIB-11-01-13, which took the extraordinary step of changing engine oil consumption specifications for N63 vehicles, and specifically instructed service technicians to add two quarts of engine oil to N63 vehicles when the vehicles instruct owners to add only one additional quart of oil. (http://www.xbimmers.com/forums/showthread.php?p=14449679.)

85. Instead of addressing the underlying cause of excessive oil consumption in order to attempt to fix the defect, BMW recommended that its service technicians simply add more engine oil to respond to consumer complaints. Technicians were instructed to add two quarts of engine oil when the vehicles electronic system specifically called for one additional quart and to also add an additional quart as the default fill on N63 vehicles. While BMW did not address the underlying problem, it likely reduced the number of complaints because the engine oil level in the subject vehicles would now be overfilled, a condition that can cause the engine oil to become aeriated, resulting in potential oil starvation and reduced oil pressure.

86. Technical Service Bulletin SIB-11-03-13 appears to be part of a campaign to conceal the oil consumption defect and represent it as a normal feature of BMW vehicles. To this effect, BMW issued SIB-11-03-13, which upon information and belief includes the following:

> Service Bulletin Number: SIB-11-03-13
>
> Summary: All engines normally consume a certain amount of engine oil. This is necessary in order to properly lubricate the cylinder walls, pistons, piston rings, valves and turbocharger(s), if equipped. In addition, engines with less than 6,000 miles will generally consume additional engine oil because the internal engine components are not fully seated (break-in). Therefore, engine oil consumption complaints received prior to 6,000 miles cannot be considered.
>
> Once a new or remanufactured engine has accumulated 6,000 miles, oil consumption can be considered if there is a drastic change in the engine oil consumption rate (e.g., the engine oil consumption rate triples) under similar driving conditions.
>
> Engines equipped with a turbocharger(s) will consume more engine oil than normally aspirated engines (non-turbocharged). The additional oil that is consumed in a turbocharged engine is mainly due to the turbocharger lubrication requirements. Some of the engine oil

10

> normally migrates past the turbocharger turbine bearing seals and will enter the intake tract of the engine.
>
> All turbocharged engines also require a complex crankcase ventilation system. The crankcase ventilation system needs to maintain a small vacuum on the crankcase and not allow the crankcase to be pressurized. Pressurizing the engine crankcase can lead to external engine oil leaks and increased engine oil consumption via the piston rings and valve seals. When the load and the boost level of a turbocharged engine is varied, the path of the crankcase pressure is changed. During the crankcase ventilation path transition, a small amount of engine oil will pass through the crankcase ventilation system and is additionally consumed. The additional engine oil consumption of a turbocharged engine, as compared to a normally aspirated engine, is normal and not a defect.
>
> Oil Consumption specification:
>
> - All BMW engines (excluding Motorsport) can consume up to 1 quart of engine oil per 750 miles at any time.
>
> - Due to the increased engine power, all Motorsport engines can consume up to 2.5 quarts of engine oil per 1,000 miles at any time.
>
> Turbocharged Engines:
>
> Engines that are fitted with a turbocharger(s) will consume more engine oil than naturally aspirated engines (non-turbocharged engines). In this case, a turbocharged engine could require topping of engine oil more frequently. For vehicles with N63 and N63T engines, refer to SIB-11-03-13 for additional details.

87. BMW included every conceivable driving situation within this Service Bulletin as a factor for engine oil consumption so as to minimize their own responsibility and/or deflect blame onto consumers for the oil consumption defect. As can be seen from the TSBs, Defendants continued to misrepresent to their customers that the rate of oil consumption in the N63 engines was normal and to be expected in engines that are fitted with turbochargers.

88. BMW made these representations notwithstanding that the stated recommended oil service interval at the time of sale of the subject vehicles was the earlier of 15,000 miles or two years. Of course, at the rate of engine oil consumption referred to in BMW's service bulletin, the N63 vehicles would consume nearly 20 quarts of engine oil between the recommended 15,000-mile oil service intervals. Clearly, there is nothing normal or expected about this rate of oil consumption.

89. Many N63 purchasers and automobile consumer advocates disagree that this level of engine oil consumption is normal and instead believe that it is excessive and well beyond normal.

90. Consumer Reports offered its opinion of excessive oil consumption in the subtitle of its article: *Excessive oil consumption isn't normal: Automakers say adding oil between scheduled changes is acceptable. It's not.* (http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

91. Following hundreds of customer complaints about the oil consumption defect and other problems with N63 vehicles, BMW launched the "N63 Customer Care Package" (bulletin B001314) on December 29, 2014 (herein, "Customer Care Package"). The Customer Care Package consisted of several different measures, which merely mask, but do not correct, the serious design and/or manufacturing defects of the N63 engine including the oil consumption defect.

92. The Customer Care Package instructed service representatives to check each covered vehicle's timing chain, fuel injectors, mass air flow sensors, crankcase vent lines, battery, engine vacuum pump, and low pressure fuel sensor, and replace if necessary. BMW instructed its service representatives to inspect and replace these components for free, even if no longer covered by the manufacturer's standard four-year/50,000 mile warranty.

93. Also, BMW had long emphasized the fact that its vehicles can go long periods without service and sold many N63 vehicles with the promise of a two-year or 15,000 mile service interval. The Customer Care Package significantly reduced the mileage of its recommended engine oil change intervals for the subject vehicles. As a result, BMW reduced the oil change intervals from the earlier of 15,000/two years to the earlier of 10,000 miles or one year.

94. BMW simultaneously launched the "N63 Customer Loyalty Offer" which offered purchasers discounts on new BMW vehicles to replace their defective N63 vehicles.

95. BMW also launched a related "N63 Customer Appreciation Program," which authorized dealerships to provide purchasers with up to $50 of BMW merchandise or accessories.

96. Engine oil is important because it functions as an essential lubricant for the moving parts in internal combustion engines. The oil creates a film separating surfaces of adjacent moving parts to minimize direct contact, thereby decreasing heat caused by friction and reducing wear. Engine oil also has important cleaning and sealing functions, and serves as an important medium for dissipating heat throughout the engine. As a result, the subject vehicles need the proper amount of engine oil in order for the engine and its related parts to function safely.

97. As suggested by the N63 Customer Care Package, upon information and belief, the oil consumption defect impacts several components of N63 vehicles, either via

combustion of excessive amounts of engine oil directly or by causing these components a lack of appropriate lubrication, which results in these components to prematurely fail and need frequent replacement.

98. The oil consumption defect is a safety concern because it prevents the engine from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted. Therefore, this oil consumption defect is unreasonably dangerous because it can cause engine failure while the subject vehicles are in operation at any time and under any driving conditions or speeds, thereby exposing the Plaintiffs, their passengers, and others who share the road with them to serious risk of accidents and injury.

99. Plaintiffs are informed and believe, and based thereon allege that BMW acquired its knowledge of the oil consumption defect in 2008, if not before, through sources not available to Plaintiffs, including but not limited to pre-release testing data, durability testing, early consumer complaints about the oil consumption defect to Defendants and their dealers, testing conducted in response to those complaints, aggregate data from BMW dealers, including dealer repair orders and high warranty reimbursement rates, as well as, from other internal sources.

100. Defendants had a duty to disclose the oil consumption defect and the associated out-of-pocket repair costs to Plaintiffs because the defect poses an unreasonable safety hazard, and because Defendants had exclusive knowledge or access to material facts about the subject vehicles that were not known or reasonably discoverable by the Plaintiffs. Defendants, however, failed to disclose the Oil Consumption Defect to consumers prior to or at the time of purchase or lease.

101. The oil consumption defect can be and has been enormously consequential to Plaintiffs, burdening them with out-of-pocket expenses that would not be necessary but for such defect and depriving them of their original bargains. First, excessive engine oil consumption requires additional service visits and increased maintenance costs due to the recently decreased oil change intervals, which the Plaintiffs specifically sought to avoid by purchasing high-end BMW vehicles. Second, the oil consumption defect means that Plaintiffs must be concerned with obtaining BMW-approved engine oil when needed. If Plaintiffs continue to drive without adding oil, their vehicles might catastrophically fail and strand them or potentially cause a life-threatening accident. This discourages Plaintiffs from traveling long distances in their N63 vehicles or forces them to carry an extra supply of oil. Third, Plaintiffs will suffer significant loss when they sell the subject vehicles because the reputation of these vehicles has been impaired by now-public research establishing that these vehicles suffer from the oil consumption defect.

102. Plaintiffs each provided Defendants or one or more of its authorized dealers with an opportunity to repair the problems with the subject vehicles. The Defendants have neglected, failed, refused or otherwise been unable to repair the substantial impairments to the subject vehicles within a reasonable amount of time or a reasonable number of attempts.

103. The oil consumption defect experienced by the Plaintiffs substantially impairs the use, value and safety of the subject vehicles to the Plaintiffs.

104. The Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to Plaintiffs' acceptance of the vehicles.

105. The Plaintiffs would not have purchased the subject vehicles had they known, prior to the respective times of purchase, that they would be required to regularly purchase and add large volumes of engine oil to the subject vehicles in order to prevent the subject vehicles' engines from failing.

## FRAUDULENT CONCEALMENT TOLLING

106. Plaintiffs did not and could not have known that there was an oil consumption defect with the subject vehicles' respective engines at the time that they purchased the subject vehicles or any time thereafter.

107. The breach of warranties four-year statute of limitations, which might otherwise apply to bar some of the Plaintiffs' claims, should be tolled because of Defendants' knowing and active concealment of the fact that the subject vehicles' engines contain a defect.

108. While Defendants issued TSB's making clear they were aware that there was a defect with the subject vehicles' engines, Defendants failed to disclose the existence of the defect to Plaintiffs.

109. Moreover, Defendants' authorized dealerships informed some or all of the Plaintiffs that the subject vehicles' excessive consumption of engine oil was normal, rather than the result of a defect.

110. Defendants kept Plaintiffs ignorant of vital information essential to the pursuit of their claims.

111. Defendants knowingly, affirmatively, and actively concealed the subject vehicles' defect from the Plaintiffs.

112. Defendants were aware of the defect with the subject vehicles.

113. Based upon the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## FIRST CAUSE OF ACTION
### Breach of Warranty Pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.*

114. The Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

115. The Plaintiffs are each a "consumer" as defined in 15 U.S.C. § 2301(3).

116. Defendants are each a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

117. The subject vehicles are each a "consumer product" as defined in 15 U.S.C. § 2301(6). 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

118. 15 U.S.C. § 2304(a)(1) requires Defendants, as warrantors, to remedy any defect, malfunction or nonconformance of the subject vehicles within a reasonable time and without charge to the Plaintiffs.

119. Despite repeated demands, Defendants have failed to remedy the subject vehicles' oil consumption defect within a reasonable time, and/or a reasonable number of attempts, thereby breaching the written and implied warranties applicable to the subject vehicles.

120. As a result of Defendants' breaches of written and implied warranties, and Defendants' failure to remedy the same within a reasonable time and without charge to Plaintiffs, Plaintiffs have suffered damages.

## SECOND CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability Pursuant to the Magnuson-Moss Federal Act, 15 U.S.C. §2301, *et seq.* and Ga. Code Ann., § 11-2-314**

121. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

122. Defendants are merchants with respect to motor vehicles.

123. The subject vehicles were each subject to implied warranties of merchantability, as defined in 15 U.S.C. § 2308 and Ga. Code Ann., § 11-2-314, running from the Defendants to the Plaintiffs.

124. An implied warranty that the subject vehicles were merchantable arose by operation of law as part of the purchase of the subject vehicles.

125. Defendants breached the implied warranty of merchantability in that the subject vehicles were not in merchantable condition when the Plaintiffs purchased them, or at any time thereafter, and the subject vehicles are unfit for the ordinary purposes for which such vehicles are used.

126. Plaintiffs notified Defendants of the defects in the subject vehicles within a reasonable time after Plaintiffs discovered them.

127. As a result of Defendants' breaches of the implied warranty of merchantability, Plaintiffs have suffered damages, including but not limited to incidental and consequential damages.

## THIRD CAUSE OF ACTION
**Breach of Express Warranty Under Ga. Code Ann., § 11-2-313**

128. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

129. In connection with the sale of the subject vehicles to the Plaintiffs, Defendants provided the Plaintiffs with a New Vehicle Limited Warranty and Certified Pre-Owned Warranty, under which they agreed to repair original components found to be defective in material or workmanship under normal use and maintenance, including the engine and its components.

130. Plaintiffs relied on Defendant's warranties when they agreed to purchase or lease the Class Vehicles and Defendant's warranties were part of the basis of the bargain.

131. Plaintiffs submitted their vehicles for warranty repairs as referenced herein. Defendants failed to comply with the terms of the express written warranty provided to each Plaintiff, by failing and/or refusing to repair the oil consumption defect under the vehicles' warranty as described herein.

132. Plaintiffs have given Defendants reasonable opportunities to cure said defect, but Defendants have been unable and/or has refused to do so within a reasonable time.

133. As a result of said nonconformities, Plaintiffs cannot reasonably rely on the subject vehicles for the ordinary purpose of safe, comfortable, and efficient transportation.

134. The Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to Plaintiffs' acceptance of the subject vehicles.

135. The Plaintiffs would not have purchased or leased the subject vehicles, or would have paid less for the subject vehicles, had they known, prior to their respective time of purchase or lease, that the subject vehicles contained the oil consumption defect.

136. As a direct and proximate result of the willful failure of Defendants to comply with their obligations under the express warranties, Plaintiffs have suffered actual and consequential damages. Such damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the subject vehicles containing the defects identified herein.

## FOURTH CAUSE OF ACTION
**Unlawful Acts and Practices
Ga. Code Ann., § 10-1-393**

137. The Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

138. The sale of the subject vehicles to the Plaintiffs under the guise that they were free from defects that would substantially impair the use, safety, or value of the subject

16

vehicles represents an unlawful or deceptive trade practice under Ga. Code Ann., § 10-1-393, *et seq.*

139. The Defendants' failure and refusal to repair the subject vehicles is unfair and deceptive practice.

140. Further, the Defendants violated Ga. Code Ann., § 10-1-393, *et seq.* in one or more of the following ways:

   a. Making of fraudulent and/or negligent representations, as herein before alleged;

   b. Representing the subject vehicles to be of good, merchantable quality, free of defects, when in fact they were not; and

   c. Failing to reveal material facts including, but not limited to, the nature of the nonconformities and defects complained of herein,

141. The Defendants are in the business of selling private automobiles and therefore the violations are likely to affect the general public, now and in the future.

142. The Defendants violated the law willfully and knowingly.

## **DEMAND FOR RELIEF**

WHEREFORE, the Plaintiffs demand judgment against Defendants as follows:

   a. An order approving revocation of acceptance of the subject vehicles;

   b. Money damages, in the form of a refund of the full contract prices, including, trade-in allowance, taxes, fees, insurance premiums, interest, and costs, and a refund of all payments made by Plaintiffs on the subject contracts;

   c. Equitable relief including, but not limited to, replacement of the subject vehicles with new vehicles, or repair of the defective subject vehicles with an extension of the express and implied warranties, and service contracts which are or were applicable to the subject vehicles, in the event that Plaintiffs are not found to be entitled to revocation;

   d. Incidental and consequential damages;

   e. Punitive damages;

   f. Reasonable attorney's fees;

   g. Such other and further relief as this Court deems just and proper.

**TRIAL BY JURY DEMANDED ON ALL COUNTS**

Dated: November 9, 2018

                                        Respectfully submitted,

By:   /s/ Sergei Lemberg
        Sergei Lemberg, Esq.
        LEMBERG LAW, L.L.C.
        43 Danbury Road
        Wilton, CT 06897
        Telephone: (203) 653-2250
        Facsimile: (203) 653-3424
        *Attorneys for Plaintiffs*